(No. 14650.—Affirmed in part and reversed in part.)
EDGAR L. SCATES *et al.* Appellants, *vs.* ELIZABETH L.
COOPER *et al.* Appellees.

*Opinion filed October 21, 1922—Rehearing denied Dec. 8, 1922.*

1. DEEDS—*when deed from mother to daughter will not be set aside for undue influence.* A deed from a mother to her daughter will not be set aside for alleged undue influence, where the proof does not show that the conveyance did not express the free will and desire of the grantor when it was made nor raise any presumption of undue influence, even though the mother, after she executed the deed, became dissatisfied, left her daughter's home and changed her mind about the disposition of the property.

2. EXECUTORS AND ADMINISTRATORS—*when a decree should not direct executor to dispose of personal property.* A decree entered after the complainant's death and the substitution of her executor as a party complainant, dismissing a bill to set aside a deed by the complainant, should not direct the executor to deliver to the defendants certain personal property which was found in a box sent to the complainant by the defendants at her request, where the evidence does not justify a finding either that the personal property belonged to the complainant at her death and passed to her executor, or that it was the property of the defendants.

APPEAL from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding.

HARPER E. OSBORN, and HART E. BAKER, for appellants.

HARRY H. KRINSKY, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This litigation arose out of unpleasant family relations. The bill was filed by Aurelia N. Scates against her daughter Elizabeth Cooper and her husband, James M. Cooper, to set aside a deed made by complainant June 29, 1916, to said daughter. At that time Mrs. Scates was a widow. She had two daughters, Elizabeth L. Cooper and Alice Allison, and a son, Edgar L. Scates, all adults and married. She had two grandchildren, the children of a deceased son, Walter. The

property conveyed was the residence of Mrs. Scates in Oak Park, Illinois, and as we understand was all the land she owned. Its approximate value was $10,000 and its rental value $600 per year. Mrs. Scates' husband died in October, 1911, and at the time the deed was made she was living in the residence with Elizabeth and her family. The bill alleges complainant was of a sensitive, retiring nature, disposed to be submissive in the presence of more positive and aggressive natures than her own rather than make an effort to assert or maintain her rights and interests against opposition; that since the death of her husband both her physical and mental condition had been weak; that in December, 1913, she allowed defendants to live with her in her home; that the aggressive and assertive manner of Elizabeth and her husband caused her to become more and more submissive to their wills; that the defendants were unkind to her, failed to provide her proper clothes, a comfortably heated room and other necessaries; that Elizabeth slapped her in anger many times and otherwise treated her unkindly, by reason of which she became afraid of having her feelings wounded or being physically hurt and ceased to make any effort to assert her own will but obeyed the orders and demands of defendants to avoid mental and physical pain; that defendants frequently threatened to leave complainant in her helpless and dependent condition and give no attention to her or her affairs; that by these means on two occasions, the dates of which complainant could not remember, defendants so overpowered her mind as to cause her to sign a will, of the contents of which she was not informed; that when complainant signed the deed in controversy she was under the same influence; that she had no recollection of signing it; that she never intended to make a present conveyance of the property to Elizabeth and never knowingly and willingly executed and delivered the deed to her; that she was misled and overreached by defendants, and the deed is void and a cloud on complainant's title. The bill

further alleges complainant never knowingly and willingly gave defendants her moneys or securities deposited in two banks in Oak Park and never signed any instrument to that effect; that during the time complainant lived with defendants she was never so seriously ill as to require a doctor or nurse; that her business interests were not complicated and required only ordinary attention; that by one of the wills referred to, a $1000 bond of an elevated railroad company was given the husband of Elizabeth; that complainant had never seen such bond and had no knowledge of having bought it; that if it was her property defendants had possession of it and should be required to account for it. The bill contains an appropriate prayer for relief. Defendants by their answer denied their guilt of the alleged misconduct toward complainant and denied she was entitled to any of the relief prayed.

The master in chancery to whom the cause was referred heard the testimony and reported that the complainant had failed to prove the bill and recommended a decree dismissing it. It was stipulated that if the claim of defendants to certain bonds mentioned in the answer was enforcible it might be enforced without the defendants filing a cross-bill. The chancellor, after overruling exceptions, entered a decree finding there was no equity in complainant's bill; that Edgar L. Scates, as executor, had in his possession three Victory notes or bonds, of the par value of $100 each, which were the property of Elizabeth's husband, a Liberty bond for $50 and a ten-dollar war-savings certificate belonging to Allen L. Cooper, minor son of Elizabeth and James, and a five-dollar war-savings certificate belonging to Elizabeth. The decree ordered the executor to deliver these to defendants. Edgar L. Scates, individually and as executor, and the daughter Alice Allison, have prosecuted this appeal.

The testimony of complainant and one of her attorneys engaged in the case was offered in her behalf. Mrs. Scates

died in June, 1920, at the age of seventy-one years. After her husband's death, in October, 1911, she alternated between living with defendants, who were occupying the Oak Park residence, and her son, Edgar, who lived in Alabama. While living with her son in Citronelle, Alabama, in 1913, the building they were living in burned and the family lost all their clothing. Mrs. Scates' nerves were affected by the excitement and loss. They went to Birmingham, Alabama, where Mrs. Scates resided with her son's family till she returned to her home in Oak Park, in December, 1913. Defendants were still living in the house and had been living there for some years previous. For a few months after Mrs. Scates' return to Oak Park, in 1913, the Coopers took care of her and paid $25 per month rent, but after April, 1914, they had the use of the house for caring for and boarding Mrs. Scates. During that period of six years Mrs. Scates received by inheritance, and from investments, money which Mrs. Cooper deposited in two Oak Park banks, amounting to a little over $11,000. The depositing of the money in the banks was entrusted to Mrs. Cooper. It was drawn out on checks drawn by her but most of them were signed by Mrs. Scates. In 1914 Mrs. Scates gave Mrs. Cooper a power of attorney to sell her real estate, make deeds, collect all money due from any source, and draw checks on all funds, wherever located. About $2000 of the money was expended in repairing the house and nearly $400 in taxes. Fourteen hundred dollars were expended in the purchase of United States bonds, and approximately $2000 was given to Edgar and other relatives of Mrs. Scates. The balance was used for family and living expenses of Mrs. Scates and the Cooper family. The residence in question, and the money referred to, constituted practically, as we understand it, the bulk of the property of Mrs. Scates.

Levi H. Fuller, a lawyer who had been the attorney of Mrs. Scates' husband, prepared a will which Mrs. Scates

executed April 13, 1915, by which the house was given to Mrs. Cooper, and Mr. Cooper was given a bond (not described) of the par value of $1000. The residue of her estate was given equally to her children, Edgar, Alice and Walter. Mrs. Scates testified the bequest to Cooper was made at the suggestion and advice of Fuller. There was written across that will by Mrs. Scates, "Revoked and canceled." In March, 1918, she executed another will, giving all her property, real and personal, to her daughter Elizabeth. The deed, as we have stated, was executed June 29, 1916. Mrs. Cooper testified that in the spring of 1916 she had a talk with her mother about the property, and Mrs. Scates said she had given her the house; that witness said she had only willed it, and a will could be broken or changed at any time; that her mother said she had promised it to her and would like to have it fixed right, if her daughter was not tired of her bargain to let her mother stay with her and have her home there; that she told her mother she and her husband intended to keep their promise, and Mrs. Scates said she would make her a deed for the house; that her mother asked her to call up lawyer Fuller and ask him to come and prepare the deed; that witness was not present when Fuller came; that after Fuller was there witness talked with her mother, who said Fuller had been there and she had asked him to prepare a deed conveying the house to witness; that Fuller prepared the deed at his office and took it to the house for execution; that he took the grantor's acknowledgment; that witness was not present at the time; that her mother told her she had signed the deed; that Fuller had taken it to his office to put his seal on it and she had told him to mail it to witness; that witness received it through the mail. Mrs. Scates testified she did not know what was in either of the wills she signed; that she never asked anyone to prepare a will for her; that she remembered Fuller bringing a paper he said was a will, which she read and signed; that she did not intend to con-

vey the property to Mrs. Cooper during her lifetime; that
when Mrs. Cooper asked her to sign papers she felt she had
to do' it; that she felt she had to do as they wanted her to;
that she never talked to Fuller about preparing the deed;
that the first she knew of it was after it was prepared and
was brought to her to sign; that she did not remember
whether she read it, but she usually read a paper before
signing it; that she did not remember Fuller coming to the
house for any purpose except the signing of a will.

The proof shows Mrs. Scates was not an aggressive or
self-assertive woman. She seems to have had little capacity
and no disposition to attend to her business affairs, but
during the six years she lived with the Coopers requested
and allowed Mrs. Cooper to attend to all her business. It
is admitted she was not mentally deranged. The most that
can be said on that question is, she was not of strong men-
tality, self-reliant and aggressive. She was quite capable of
knowing and comprehending the nature and effect of her
acts. The real claim of appellants is based on the testimony
of Mrs. Scates that she was dominated and controlled by
Mrs. Cooper and her husband and was afraid to refuse to
sign any paper they requested her to sign; that a confiden-
tial and fiduciary relation existed between Mrs. Scates and
Mrs. Cooper, who took advantage of that relation and of
Mrs. Scates' fear and submission to her will to procure the
conveyance against the wishes of Mrs. Scates. The proof
warrants the conclusion that there was at least as much, if
not more, respect and affection between Mrs. Scates and
Mrs. Cooper than there was between Mrs. Scates and either
of her other children. After the fire occurred in Citronelle,
Alabama, where she was living with her son, Edgar, and
they moved to Birmingham, Mrs. Scates wrote Mrs. Cooper,
in October, 1913, telling her of her distress and of the un-
comfortable house they were occupying. She also empha-
sized that she was unhappy on account of the treatment
she received from her son's wife and her conduct gener-

ally.  She thanked Mrs. Cooper for inviting her to come
and live with her, said it was very kind and she thought
she would be better off with Mrs. Cooper, and if she came
she would try to be as little trouble as possible.  Previous
correspondence between Mrs. Scates and Mrs. Cooper indi-
cated a strong affection between them.  Mrs. Cooper's hus-
band was for a number of years a Presbyterian preacher in
Indiana.  In 1905 he quit preaching and with his family
moved into the Scates house, in Oak Park.  They lived there
about a year and then moved into a house which they had
bought on the installment plan.  They lived there about four
years, then gave up paying for the place and moved back
into Mrs. Scates' house in 1910.  Cooper was for a time
engaged in the insurance business, then as book-keeper for
an industrial concern at $20 per week, and then secured a
position with the Federal court at a salary of $125 per
month, which position he held at the time of the hearing.
Mrs. Scates' husband was alive until October, 1911.  Most
of the time before his death he and his wife were visiting
and living elsewhere than in the Oak Park home.  While
Mrs. Scates was living with her son in the south, in 1913,
Mrs. Cooper offered to go there and accompany her mother
home to Oak Park.  Mrs. Scates wrote she had not the
money to pay the expense but longed to be with one of her
daughters; that she felt like an intruder where she was.
In December, 1913, she was accompanied by a nurse from
her son's home in the south to Oak Park, where she lived
in the house with Mrs. Cooper till July, 1919.  During that
time she and Mrs. Cooper did not all the time live amicably
and harmoniously.  No doubt Mrs. Scates was whimsical,
childish, and her conduct required some patience and self-
control on the part of Mrs. Cooper.  It is to be regretted
that the record does not show Mrs. Cooper's conduct to-
ward her mother while they lived together from 1913 to
1919 was always characterized by that gentleness and pa-
tience that should be shown by a daughter to her aged

mother. Mrs. Scates does not appear to have been in any sense unkind or cross toward Mrs. Cooper, but no doubt at her age and with her disposition and characteristics she was sometimes, perhaps, rather annoying and vexing, and Mrs. Cooper, unfortunately, did not have the fortitude and self-control to overlook it. The proof does not justify the conclusion that Mrs. Cooper used physical violence toward her mother, but she did sometimes say things which were disrespectful, unfilial and unkind. None of these things, however, were said or done when the deed was made. Mrs. Scates told Mrs. Cooper at different times that she should have the home, or that she would reward her for her trouble. In both wills she made she devised the house to Mrs. Cooper, and when Mrs. Cooper said a will might be broken or changed, Mrs. Scates said she would make a deed. Levi H. Fuller, an attorney living in Oak Park near Mrs. Scates' residence and who had been her husband's attorney, prepared the first will she made, also the deed, and took the acknowledgment to it. He testified for defendants that after conversations with Mrs. Scates he prepared the will at his office and took it to her at her residence. Mrs. Scates read it over and said it was what she wanted, signed it and requested the witnesses to attest it. ·Afterwards he had three conversations with her at her residence about making the deed. At her request he prepared the deed. He got the description of the lot from a tax receipt which Mrs. Scates requested Mrs. Cooper to get from her papers. The deed was drawn at witness' office. He took it to Mrs. Scates' residence for her to sign and took her acknowledgment. None of the Coopers were present when the deed was executed. Mrs. Scates told witness after he took it to his office and put his seal on it, to mail it to Mrs. Cooper, which he did. The second will of Mrs. Scates was prepared by the defendant James L. Cooper in March, 1918. He testified he drew it at her request and she signed it after reading it. While Mrs. Cooper was in Rochester, Minne-

sota, where her son was in a hospital for an operation, prior to July, 1919, Edgar, who then lived in Battle Creek, Michigan, stopped at Oak Park to see his mother on his way to Sterling, Illinois. That was the first time he had seen her since December, 1913. He had previously written Mrs. Cooper he was coming. He remained at the house with his mother about four days. While there she gave him $50. Cooper wrote his wife about it, and she wrote Edgar some very sharp letters about his going to the house when he knew he was not welcome there, and that it was an outrage for him to take advantage of her absence. She also wrote her mother a very bitter letter about it. Mrs. Scates wrote Edgar that Mrs. Cooper insisted on her asking him to return the $50. Edgar had asked his mother to come to his house in Battle Creek, and Mrs. Cooper wrote him if Mrs. Scates went to his home she could not come back to the Oak Park residence. She also wrote her mother that if she went to Edgar's she would have to stay there permanently. On Edgar's way home he stopped again at Oak Park, and on July 26, 1919, took his mother with him to his home in Battle Creek. After that she never returned to Oak Park. December 23, 1919, she filed the bill in this case. Her death occurred in June, 1920.

On cross-examination Mrs. Scates testified she once told Mrs. Cooper she was willing she should have the property after her death; that she was satisfied to let her have it then, but now she was not willing she should have it; that the change in her feelings had come about since July, 1919, because of the way Mrs. Cooper treated her; that Edgar's wife said things to her after she left Oak Park which caused her to change her feelings toward the Coopers; that they said Mrs. Cooper did not do well by her, and after that she felt she had given Mrs. Cooper more than she was entitled to, because she thought Edgar needed it more than she did. Mrs. Scates told three women friends who were about her own age that she had given the property to Mrs. Cooper be-

cause she was taking care of her. She also told a plumber who was at work in the house that she had deeded it to Mrs. Cooper. Appellants offered no proof of the character of treatment Mrs. Scates received at Mrs. Cooper's or that she ever complained of it.

The grounds upon which appellants seek to reverse the decree are that a confidential and fiduciary relation existed between Mrs. Scates and her daughter Mrs. Cooper, and the burden was on defendants to prove that the conveyance was a deliberate and intelligent act for the benefit of the grantor and was free from fraud and suspicion, also that it was not the result of undue influence. Conceding a fiduciary relation existed, we cannot say the decree is wrong in denying the relief prayed, under the testimony. Mrs. Scates was in the full possession of her mental faculties. It is true, Mrs. Cooper appears to have been a more positive character and of stronger mentality than her mother and sometimes talked to her in a manner no daughter should talk to her mother and complained of the trouble she was to her. They lived together in the same house from December, 1913, to June 29, 1916, before the deed was made. While Mrs. Scates' memory was very bad about the circumstances under which the deed was made, Fuller, who appears to be a disinterested witness, testified fully to the circumstances of making the deed, and from his testimony it appears to have been the free act of Mrs. Scates for the purpose of carrying out a desire she had entertained for some time previous. The will she executed in April, 1915, gave the house to Mrs. Cooper. She wrote across the face of that will that it is "revoked and canceled." Nearly two years after that deed was made she executed another will, by which she gave all her estate, real and personal, to Mrs. Cooper. Whatever the real truth may be, the proof does not show that the conveyance did not express the free will and desire of the grantor when it was made. The conveyance was beneficial to both grantor and grantee, and under

the evidence in this case the law will not stamp the deed as *prima facie* illegal because of the relationship of the parties, nor was the testimony sufficient to raise the presumption of undue influence because of their relations. These questions have been the subject of discussion so frequently that we deem it sufficient to cite some of the cases without discussing or quoting from them. *Smith* v. *Kopitzki,* 254 Ill. 498; *Sears* v. *Vaughan,* 230 id. 572; *Bishop* v. *Hilliard,* 227 id. 382; *Sturtevant* v. *Sturtevant,* 116 id. 340; *Francis* v. *Wilkinson,* 147 id. 370.

We are of opinion the proof warranted the conclusion of the master and the decree of the court that appellants did not prove a case which would have justified a decree setting the deed aside. After Mrs. Scates, at the request of Edgar and of her own volition, went to Edgar's house, in July, 1919, she changed her mind and did not want Mrs. Cooper to have the home, but when she made the deed it represented her will and desire. Because she subsequently changed her mind would not of itself authorize a court to set the deed aside.

Mrs. Cooper and her husband were permitted, after the death of Mrs. Scates, to testify in their own behalf, and appellants contend they were not competent witnesses, because then the complainants in the bill were the executor and heirs of Mrs. Scates. Substantially all of Mrs. Cooper's testimony related to acts, transactions and conversations about which Mrs. Scates testified before her death. The same, we think, cannot be said of the testimony of James Cooper, who appears to have had such anxiety to tell his story that his testimony was not confined entirely to those matters as to which he was competent under our statute on evidence. However, his testimony was not of a character to very favorably impress us, and in our judgment it was entitled to, and received, little consideration in the determination of the case. If his entire testimony were stricken

out it would not affect the correctness of the decree as to the deed.

After Mrs. Scates went to her son's home in Battle Creek she authorized and directed one of her counsel to open her safety deposit box at the bank in Oak Park, take out the contents and send them to her at Battle Creek, which he did. Defendants claimed there were some Liberty bonds in the box and a small amount in war-savings certificates belonging to them and their minor son, Allen. It was stipulated, as we have said, between counsel that if defendants' claims were established they might be enforced without filing a cross-bill. The court found and decreed that the executor had in his possession as executor $300 in Liberty bonds belonging to James Cooper, a five-dollar war-savings certificate belonging to Mrs. Cooper, and a bond for $50 and a war-savings certificate for $10 belonging to defendants' minor son, Allen. The executor was ordered to deliver them up to defendants. This, we think, was erroneous. The bonds and other contents of the safety deposit box were sent to Mrs. Scates at Battle Creek in August, 1919. She died in June, 1920. Even if the stipulation authorized the court to define and enforce the rights of the parties to the securities claimed by defendants in this proceeding, there was no evidence to justify the finding that Mrs. Scates owned and possessed them at the time of her death and that they passed to her executor. Neither are we willing to approve the finding that the securities were the property of defendants.

That part of the decree relating to the securities will be reversed and the part holding the deed valid and dismissing complainants' bill is affirmed. Three-fourths of the costs will be taxed to appellants and one-fourth to appellees.

*Affirmed in part and reversed in part.*